UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ETNID R. LOPEZ,

        Petitioner,

v.                                              No. 21-cv-11192-AK

NELSON ALVES, Superintendent
MCI Norfolk

        Respondent.

**REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF HABEAS CORPUS**

CABELL, U.S.M.J.

I.    **INTRODUCTION**

Petitioner Etnid R. Lopez ("Lopez" or "the petitioner") is currently serving a life term of incarceration following his state court conviction for first-degree murder. He petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeking to vacate his conviction on various grounds. The matter has been referred to this court for a report and recommendation. For the reasons discussed below, I find the petitioner's claims to be without merit and recommend that the petition be denied.

## II.  <u>RELEVANT BACKGROUND</u>

The court takes the facts from the Massachusetts Supreme Judicial Court's (SJC') opinion,[1] reserving some facts for later discussion as appropriate:

> At approximately 11:30 P.M. on June 25, 2010, the defendant, his girlfriend Kayla Lawrence, Jared Brown-Garnham (Garnham), and Michelle Torrey drove to a convenience store in Taunton.  The defendant wore a white T-shirt, and Garnham wore dark clothing with a blue bandana.  Upon arrival, the defendant entered the convenience store and Lawrence stood in the parking lot with Garnham.  While waiting for the defendant, Lawrence saw the victim [Tigan Hollingsworth] and exchanged heated words with him.  Lawrence was familiar with the victim and had witnessed him, along with a group of other people, "jump" the defendant's brother, Jean Carlos Lopez (Jean), a few years earlier.  Soon thereafter, the defendant came out of the store and, with a knife in his hand, began chasing the victim around the parking lot.  Torrey got out of her vehicle and attempted to restrain the defendant, holding him back by his arms, but the defendant eventually broke free and continued to chase the victim.  During this time, Jean and the defendant's uncle, Erving Cruz, drove into the parking lot.  As Cruz got out of the vehicle, he pointed at the victim and shouted, "Is that him?  Is that him?  Get him."  Cruz and Jean joined the defendant in chasing the victim around the parking lot.  The victim then ran out of the parking lot and down the street.
>
> Two witnesses, Brittany Machado and Matthew D'Alessandro, observed the events at the convenience store parking lot as they waited in their vehicle at a red light directly across the intersection.  Both

---

[1] In habeas proceedings initiated by a prisoner in state custody, "a determination of factual issues by the State court should be presumed to be correct."  28 U.S.C. § 2254(e)(1).  The petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  *Id*.  This presumption of correctness extends to factual findings by state appellate courts.  *Rashad v. Walsh*, 300 F.3d 27, 35 (1st Cir. 2002).  The petitioner does not challenge the SJC's factual findings and in any case has not presented clear and convincing evidence to rebut the presumption that the SJC's factual findings are correct.

witnessed the victim flee down the street chased by two men: one in a white T-shirt, and the other, who had just got out of a vehicle in the parking lot, in a black tank top and baggy black clothes.  Both witnesses observed the chase as they drove parallel to the three men.  As the witnesses made a left turn into their driveway, the victim and his two pursuers almost hit their car. D'Alessandro witnessed the three males turn back toward the convenience store before turning down a driveway one house down the street.

As Machado parked the car, they both heard the sound of the chain-link fence to their left clanging. D'Alessandro then saw the victim in his neighbor's back yard, illuminated by a motion-activated spotlight, followed by the man in the white T-shirt and the man in the black tank top.  The two men then attacked the victim, holding him and hitting him. As the victim fell to the ground, D'Alessandro heard the man in the black tank top ask, "Did you get him? Did you get him?"  The man in the white T-shirt responded, "Yes I got him." The two men then jumped over the fence and fled.

The victim suffered from thirteen stab wounds, several of which penetrated his chest cavity.  His cause of death was collapsed lungs and massive blood loss.

*Commonwealth v. Lopez*, 151 N.E.3d 367, 372-73 (Mass. 2020) (footnotes omitted).

On October 1, 2010, a grand jury returned an indictment charging Lopez with murder in connection with the stabbing death of Tigan Hollingsworth.  Lopez was 17 years old at the time of the murder.  Lopez filed a pretrial motion to suppress statements he made to police, which the trial court denied.  Subsequently, on August 13, 2014, a Bristol County Superior Court jury found Lopez guilty of first-degree murder.

Lopez appealed his conviction to the SJC on December 1, 2015. While the appeal was pending, the SJC granted Lopez leave to file a motion for a new trial in the superior court. Lopez filed the motion, which was denied. The SJC consolidated Lopez's direct appeal with his appeal of the denial of his motion for a new trial, ultimately affirming the lower court's rulings. *Lopez*, 151 N.E.3d at 367. The petitioner timely filed the instant habeas petition on July 23, 2021.

## III. <u>THE HABEAS PETITION</u>

The petitioner identifies three ways in which the state court proceedings allegedly violated his constitutional rights:

(1) The trial court admitted the petitioner's statements to police into evidence based on an erroneous determination that he voluntarily waived his *Miranda* rights and voluntarily made the statements;

(2) The petitioner's trial counsel provided ineffective assistance of counsel by failing to investigate Garnham's death, as such an investigation would have uncovered exculpatory evidence[2]; and

(3) The trial court erroneously admitted the out-of-court statements of an alleged joint venturer, thereby

---

[2] Specifically, as elaborated below, the petitioner contends that an investigation into Garnham's death would have turned up an unbiased witness who would have testified that Garnham bragged to her about being the one who stabbed the victim.

depriving the petitioner of his right to confront the

witnesses against him and of due process.

(Dkt. No. 1, Petition, pp. 6-9).

## IV.  **LEGAL STANDARD**

Under the Anti-Terrorism and Effective Death Penalty Act of

1996 ("AEDPA"), a federal court may only grant habeas relief on

claims that have been adjudicated on the merits, and then only

after the petitioner has exhausted all available state remedies.

28 U.S.C. § 2254(c); *see O'Sullivan v. Boerckel*, 526 U.S. 838, 845

(1999) ("state prisoners must give the state courts one full

opportunity to resolve any constitutional issues"); *see also*

*Sanchez v. Roden*, 753 F.3d 279, 294 (1st Cir. 2014) (quoting

*Casella v. Clemons*, 207 F.3d 18, 20 (1st Cir. 2000)) ("A claim

based on federal law is not exhausted unless a petitioner has

'fairly and recognizably' presented it to the state courts.").

Under the AEDPA, habeas relief is only permitted if the previous

adjudication

> (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly
> established Federal law, as determined by the Supreme
> Court of the Unites States; or (2) resulted in a decision
> that was based on an unreasonable determination of the
> facts in light of the evidence presented in the state
> court proceeding.

28 U.S.C. § 2254(d).  To obtain relief, then, "a state prisoner

must show that the state court's ruling on the claim being

presented in federal court was so lacking in justification that

there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

## V.   **DISCUSSION**

### 1.   **Admission of Lopez's Statements to Police**

At the petitioner's trial, prosecutors presented a redacted version of his videotaped interrogation. *Lopez*, 151 N.E.3d at 376. The substance of the petitioner's statements during the interrogation was his claim that, "although he chased the victim around the convenience store parking lot for a short time, he decided to stop running when the victim left the convenience store parking lot and continued to run down the street." *Id.* at 376 n.9. The petitioner, who had unsuccessfully moved to suppress his statements before the trial, argued to the SJC that the trial court should not have admitted his statements both because his *Miranda* waiver was involuntary and because the statements themselves were involuntary. *Id.* at 376. The SJC found that the petitioner was in custody during the interrogation, thus triggering *Miranda*, but continued on to find that, under the totality of the circumstances, the petitioner knowingly and validly waived his *Miranda* rights and voluntarily made statements to the police. *Id.* at 377-80. At

every step, the SJC acknowledged that the petitioner's age was a relevant factor. *Id.*

The petitioner now contends that the SJC unreasonably applied clearly established federal law by only giving "lip service" to the age factor and "fail[ing] to apply the heightened standard that governs juvenile interrogation in a meaningful way." (Dkt. No. 13, Petitioner's Memorandum of Law, p. 18). The respondent argues that, consistent with established Supreme Court precedent, the SJC considered the petitioner's age but found it outweighed by other relevant factors. The respondent has the better argument.

The Supreme Court has long recognized that juveniles are more susceptible to police pressure than adults. *See Gallegos v. Colorado*, 370 U.S. 49, 54 (1962); *Haley v. State of Ohio*, 332 U.S. 596, 599-600 (1948) (plurality opinion). For this reason, determining whether a juvenile validly waived his *Miranda* rights requires an "evaluation of the juvenile's age, experience, education, background, and intelligence" as part of the familiar totality of the circumstances analysis. *Fare v. Michael C.*, 442 U.S. 707, 725 (1979). While age is relevant to the analysis, "[t]his is not to say that a child's age will be a determinative, or even a significant, factor in every case." *J.D.B. v. North Carolina*, 564 U.S. 261, 277 (2011) (discussing age as a factor in the custody prong of the *Miranda* analysis); *see also Fare*, 442 U.S. at 725-26 ("At the same time, th[e totality] approach refrains

from imposing rigid restraints on police and courts in dealing with an experienced older juvenile with an extensive prior record who knowingly and intelligently waives his Fifth Amendment rights and voluntarily consents to interrogation.").

In considering whether the petitioner validly waived his *Miranda* rights, the SJC noted that

> [t]he validity of a Miranda waiver depends on the totality of the circumstances, including "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence, and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings."

*Lopez*, 151 N.E.3d at 378 (quoting *Commonwealth v. Jackson*, 731 N.E.2d 1066, 1070 (Mass. 2000)).[3]  Turning to the facts of the case, the SJC explicitly acknowledged the concern that the petitioner's age may have contributed to an involuntary waiver, particularly when combined with the investigators' use of deceptive tactics and the fact that the petitioner was not accompanied by an adult.[4]  *Id.* at 379 & n.12.  At the same time, the SJC noted that

---

[3] The petitioner does not argue that the SJC erred in applying Massachusetts rather than federal law, and it appears to this court in any case that Massachusetts law is consistent with federal law on this point.

[4] At the time of the interrogation, Massachusetts law only entitled those under the age of seventeen to the presence of an "interested adult" during police interrogation.  *Lopez*, 151 N.E.3d at 379 n.12.  After the petitioner's interrogation, the SJC "expanded the interested adult rule to apply to

> [h]ere, the defendant appeared alert, calm, and composed. He indicated that he was in high school and demonstrated no difficulty communicating with or understanding the officers. As each of the Miranda rights was read to the defendant from a printed form, the defendant nodded and responded affirmatively to indicate that he understood. The defendant then readily signed the form acknowledging that he had been informed of and understood his Miranda rights.

*Id.* at 378-79. Weighing these competing facts, the SJC agreed with the trial court "that the defendant gave every indication that he understood his Miranda rights and voluntarily relinquished them." *Id.* at 379. It went on to find that the petitioner's statements were voluntary for substantially similar reasons. *Id.* at 380. This was a reasonable decision based on the evidence presented, and certainly not "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.[5]

Resisting this conclusion, the petitioner argues that the SJC improperly minimized his age given the "special care" the Supreme Court requires when considering the voluntariness of a juvenile's

---

seventeen[-]year[-]old individuals on a prospective basis" based on new legislation. *Id.* (citing *Commonwealth v. Smith*, 28 N.E.3d 385, 386, 390 (Mass. 2015).

[5] In his reply brief, the petitioner, relying on *Miller v. Fenton*, 474 U.S. 104, 112, 117-18 (1985), asserts that this court should independently assess whether the petitioner voluntarily waived his *Miranda* rights and made statements, essentially reviewing the SJC's decision *de novo*. The court notes that the decision in *Miller* predated the passage of the AEDPA, which enhanced the deference afforded to state court decisions under 28 U.S.C. § 2254(d), and so it is likely no longer good law. *See Williams v. Cook*, No. 1:14-cv-235, 2015 WL 1737276, at *3 (S.D. Ohio Apr. 16, 2015); *Saelee v. Mayle*, No. C 99-3252 MJJ PR, 2000 WL 288441, at *12 n.4 (N.D. Cal. Mar. 10, 2000).

statements.  *See Haley*, 332 U.S. at 599.  Specifically, the petitioner contends that,

> instead of using a heightened standard that took into account juveniles' disproportionate vulnerability to the pressures of interrogation, . . . the SJC evaluated petitioner's waiver as if he were an adult, ignoring modern developmental science and Supreme Court jurisprudence that children must be protected as they are different from adults.

(Dkt. No. 13, p. 21).  This argument fails for multiple reasons.

First, the petitioner does not identify any Supreme Court precedent that clearly establishes a "heightened standard" for evaluating voluntariness as to juveniles, nor is this court aware of any.  As discussed, age is a (potentially significant) factor to be considered and weighed in the totality of the circumstances analysis like any other.  *J.D.B.*, 564 U.S. at 277; *Fare*, 442 U.S. at 725.  The inclusion of this factor in the totality of the circumstances test incorporates the need for "special care" articulated in earlier opinions.  *See, e.g.*, *Haley*, 332 U.S. at 599.  Although age is relevant to the voluntariness inquiry, the Supreme Court has never held the inquiry takes on a different character when juveniles are involved or that a changed or heightened standard applies.

Second, the petitioner argues that the SJC treated him like an adult by failing to recognize that deceptive tactics like the ones investigators employed in his interrogation "exert[] greater influence on juveniles" than on adults.  (Dkt. No. 13, p. 20).  At

core, this boils down to arguing that the SJC placed insufficient weight on the petitioner's age in weighing the relevant factors. Again, the petitioner fails to persuade that the SJC's discretionary decision that he voluntarily waived his *Miranda* rights and made statements to the police was so clearly erroneous that no fair-minded jurist could possibly agree with it. *See Harrington*, 562 U.S. at 103; *see also Yarborough v. Alvarado*, 541 U.S. 652, 669 (2004) (O'Connor, J., concurring) ("17 ½-year-olds vary widely in their reactions to police questioning, and many can be expected to behave as adults"); *Fare*, 442 U.S. at 726-27 (finding that 16 ½-year-old juvenile voluntarily and knowingly waived his Fifth Amendment rights).

Finally, insofar as the petitioner argues that the SJC erred by not considering "the science on adolescent brain development on which the Supreme Court has drawn in providing greater protection for juveniles," (Dkt. No. 19, Petitioner's Reply Brief, p. 2), this position finds no support in Supreme Court precedent. The Supreme Court has never held that a court must consider cognitive science or require expert testimony when evaluating whether a juvenile voluntarily waived his rights or voluntarily made statements.[6] In fact, the Court has said the opposite. *See J.D.B.,*

---

[6] Most of the cases the petitioner cites to demonstrate the Supreme Court's emphasis on scientific research into adolescent brain development concern sentencing and have nothing to do with whether a juvenile voluntarily waived his rights or made statements. *See Miller v. Alabama*, 567 U.S. 460 (2012); *Graham v. Florida*, 560 U.S. 48 (2009); *Roper v. Simmons*, 543 U.S. 551 (2005).

564 U.S. at 278-80 ("In short, officers and judges need no imaginative powers, knowledge of developmental psychology, training in cognitive science, or expertise in social and cultural anthropology to account for a child's age. They simply need the common sense to know that a 7-year-old is not a 13-year-old and neither is an adult.").

In short, the petitioner has failed to demonstrate that the SJC unreasonably applied federal law in upholding the admission of his statements.

### 2. Failure to Investigate Garnham's Death

The petitioner next argues that his trial counsel provided ineffective assistance, in violation of his Sixth Amendment right to counsel, by failing to investigate Garnham's death. The petitioner contends that an investigation would have uncovered the existence of an unbiased witness who would testify that Garnham had told the witness that he was the one who stabbed the victim. The respondent, siding with the SJC, argues that trial counsel's decision not to pursue this investigation was reasonable and that, in any case, the evidence such an investigation might have revealed would not likely have changed the outcome of the petitioner's trial.

### a. *Garnham's Death*

The circumstances of Garnham's death are grisly. At some point following the murder, Garnham left Massachusetts, apparently

residing in either Pennsylvania or West Virginia.  (Dkt. No. 13-1, Appendix to Petitioner's Memorandum, pp. A.118, A.226-27).  In or about August 2013, Garnham began a romantic relationship with Ashley Spring ("Spring").  (*Id.* at p. A.231).  This relationship was rocky at best, as Garnham physically abused Spring on multiple occasions.  (*Id.*).  During their relationship, Garnham "bragged" to Spring about stabbing the victim and told her that he cut his long hair after the murder so that witnesses would not be able to identify him.  (*Id.*).

On December 7, 2013, Spring picked Garnham up at his residence and drove him to a bus station in Pittsburgh.  (*Id.* at p. A.118).  Spring's two children were in the car, including her eight-month-old baby.  (*Id.* at pp. A.117-18).  Garnham was to take a bus to Boston because he was scheduled to testify at the petitioner's brother's trial regarding the murder.  (*Id.* at p. A.118).  Enroute to the station in Pittsburgh, Garnham became agitated after receiving several phone calls.  (*Id.*).  After reaching the station, Garnham decided not to return to Massachusetts, fearing that he might be held responsible for the murder if he returned.  (*Id.*).  After Spring stopped at a market on the way back so that she and her older child could use the restroom, Garnham accused Spring of calling the police.  (*Id.*).  Garnham then drove off in Spring's car with the younger child still in the back seat.  (*Id.*).  Shortly thereafter, police found and pursued Garnham in the stolen vehicle.

(*Id.* at p. A.119).   The pursuit resulted in a standoff at Pittsburgh International Airport, where Garnham drew a knife and threatened to harm both the eight-month-old child and himself. (*Id.* at p. A.131).   An officer shot Garnham in the head, killing him and apparently saving the child.   (*Id.* at pp. A.131-32).   The petitioner contends that his trial counsel would have learned of Spring and her potentially exculpatory testimony had said counsel investigated Garnham's death, and the failure to do so constituted ineffective assistance.

     b.   *Ineffective Assistance Standard*

To demonstrate ineffective assistance of counsel, a petitioner must show that his representation by counsel (1) "fell below an objective standard of reasonableness" and (2) that "but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).   This test creates a high burden for the petitioner to overcome.   "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."   *Id.* at 690; *see also Knight v. Spencer*, 447 F.3d 6, 15 (1st Cir. 2006) (noting that petitioner must show his "counsel's choice was so patently unreasonable that no competent attorney would have made it").

The reasonableness of the attorney's representation is viewed "as of the time of counsel's conduct."   *Strickland*, 466 U.S. at

690.   Judicial   scrutiny   of   counsel's   representation   and performance must be "highly deferential," and the court should make "every effort . . . to eliminate the distorting effects of hindsight."   *Bell v. Cone*, 535 U.S. 685, 698 (2002) (internal quotation marks omitted).

To demonstrate prejudice, a petitioner must show "that there is a reasonable probability" that, but for the attorney's deficient performance,   there   would   have   been   a   different   outcome. *Strickland*, 466 U.S. at 694.   A "reasonable probability is one 'sufficient to undermine confidence in the outcome.'"   *Johnston v. Mitchell*, 871 F.3d 52, 64 (1st Cir. 2017) (quoting *González-Soberal v. United States*, 244 F.3d 273, 278 (1st Cir. 2001)).

For   ineffective   assistance   claims   raised   in   the   habeas context, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable . . . [which] is different from asking whether defense counsel's performance fell below *Strickland*'s standard."   *Harrington*, 562 U.S. at 101.   This review is "doubly deferential," *Cullen v. Pinholster*,   563   U.S.   170,   190   (2011)   (quoting   *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)), as "federal courts are to afford 'both the state court and the defense attorney the benefit of the doubt.'"   *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)).   A state court's decision that a petitioner's counsel was not constitutionally

ineffective "precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough*, 541 U.S. at 664). In other words, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 105.

    c.  *Reasonable Performance*

In the first instance, the SJC found that trial counsel's decision not to investigate Garnham's death was not manifestly unreasonable. *Lopez*, 151 N.E.3d at 382. The SJC noted that "nothing about the particular circumstances in which Garnham died suggested a connection between his death and the killing of the victim" such that trial counsel should have known that an investigation would likely bear fruit for the petitioner. *Id.*; *see Strickland*, 466 U.S. at 691 ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."). Indeed, the petitioner's trial counsel says as much in his affidavit: "I did not foresee that the police records [of Garnham's death] would contain any information that could potentially exculpate [the petitioner] in the stabbing." (Dkt. No. 13-1, pp. A.236, ¶ 14). There was no way for counsel to know that Garnham's bizarre

kidnapping of an infant and subsequent death at the hands of police -- more than three years after the murder -- was preceded by agitating phone calls or Garnham's refusal to return to Massachusetts and testify.

To be sure, the petitioner makes much of the timing of Garnham's death, arguing that his trial counsel should have recognized the likelihood that Garnham's death was related to the murder because it occurred shortly before Garnham was to testify at the petitioner's brother's trial.  But this one fact hardly makes it clear that Garnham's death had anything to do with the petitioner's case.  Moreover, Garnham notably had already returned to Massachusetts once before to testify in Cruz's trial earlier that year.  *Lopez*, 151 N.E.3d at 382.  The petitioner fails to explain why his trial counsel should have inferred that Garnham's death was a product of his trying to avoid testifying when he had testified on the same subject several months before without incident.

Considering the arguments presented and the deference due to both trial counsel and the state court, *see Woods*, 578 U.S. at 117, this court agrees with the SJC that the petitioner's trial counsel made a reasonable decision not to investigate Garnham's death.  More importantly, the SJC's decision was not so unreasonable that all fair-minded jurists would agree that it was incorrect.  *See Harrington*, 562 U.S. at 101.  Although this is

sufficient to resolve the petitioner's ineffective assistance claim, the court, as the SJC did, also considers the second *Strickland* prong for the sake of completeness.

    d.   *Prejudice to the Petitioner*

The SJC articulated two reasons why Spring's testimony about Garnham's alleged confession "likely would not have influenced the jury's conclusion." *Lopez*, 151 N.E.3d at 382. First, even if the jury believed Garnham's confession, that would not have exculpated the petitioner, who was charged as a joint venturer in the murder. *Id.* Under that theory, "the Commonwealth needed only to demonstrate that the [petitioner] was engaged with others in the attack with the requisite intent." *Id.* Second, Spring's testimony "would have been cumulative to evidence that the defense had presented at trial demonstrating that Garnham was involved in the attack and, more specifically, that he told others of his involvement." *Id.* at 382-83. This evidence included

> testimony from Lawrence suggesting that Garnham allegedly disposed of a knife after the stabbing, . . . testimony from an investigator that in the days afterward Garnham cut his hair and then left the State[, . . . and] two witnesses who testified that Garnham made several statements implicating himself in the attack.

*Id.* at 383 n.14. The petitioner also presented testimony from Garnham's brother, who testified that (1) Garnham told him that he was the one who killed the victim and that the other attackers thought he was just punching the victim in the head; (2) Garnham

burned the clothes he was wearing after the attack because they were bloody; (3) he was the one who gave Garnham the alleged murder weapon, which he identified at trial; and (4) Garnham cut his hair days after the murder and just before being interviewed by the police.  (Dkt. No. 13-1, p. A.234, ¶ 8).

There was no question that the petitioner was engaged with others in the attack.  Although the two eyewitnesses differed on whether they saw two or three attackers, both testified that only one of the attackers wore white.  *Lopez*, 151 N.E.3d at 382 n.13. The petitioner wore a white t-shirt during the attack; Cruz and Garnham both wore dark shirts.  *Id.* at 373 n.3, 382 n.13.  Perhaps for that reason the petitioner here focuses on intent, arguing that evidence that Garnham, not the petitioner, was the one who stabbed the victim would cast doubt on whether the petitioner had the specific intent to kill the victim.  This was the petitioner's entire defense at trial, and he introduced ample evidence to support it.  Nonetheless, the jury found the petitioner guilty of first-degree murder.

The only explanation the petitioner offers as to how Spring's testimony might have changed the outcome of the trial is that Spring, unlike the petitioner's other witnesses, was wholly disinterested, and so the jury would have been more likely to credit her testimony.  However, there is no clear indication that the jury did not believe the other witnesses.  In that regard, the

verdict is entirely consistent with a finding that Garnham was the one who stabbed the victim, but the petitioner nonetheless participated in the attack with the requisite intent. Under the circumstances, the absence of one witness's duplicative testimony, however credible, does not "undermine confidence in the outcome" of the trial, *Johnston*, 871 F.3d at 64, and the SJC's decision on that point is hardly outside the bounds of reasonableness. *See Harrington*, 562 U.S. at 101.

As a final point, the petitioner's apparent presumption that the prosecution was required to show a specific intent to *kill* as opposed to some other act is not correct. Under Massachusetts law, the intent required for murder is "an intent to cause death, to cause grievous bodily harm, or to do an act which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow." *Commonwealth v. Castillo*, 153 N.E.3d 1210, 1217 (Mass. 2020) (internal quotation marks omitted). The evidence is uncontroverted that the petitioner intended to and did at a minimum inflict grievous bodily harm on the victim by beating him unconscious. Indeed, the jury found that the respondent acted with "extreme atrocity or cruelty" in carrying out the attack. *Lopez*, 151 N.E.3d at 372. In any event, the petitioner fails to explain why it would matter that the jury, with the benefit of Spring's testimony, might not have found that he specifically

intended to kill the victim given the inescapable evidence that he at least intended to cause the victim grievous bodily harm.  It seems clear, then, that Spring's absence did not meaningfully prejudice the petitioner.

### 3.  Admission of Joint Venturer's Statements

Finally, the petitioner takes issue with the admission at his trial of two statements Cruz made, one shortly before the murder and one immediately after.  Specifically, an eyewitness testified that, as the petitioner and another man (later identified as Cruz) chased the victim around the parking lot, Cruz shouted, "Is that him?  Is that him?  Get him."  *Id.* at 373.  That same eyewitness testified that later, as the victim fell to the ground, he heard Cruz ask the petitioner, "Did you get him?  Did you get him?" and heard the petitioner respond, "Yes I got him."[7]  *Id.*  The petitioner argues that the trial court erred in admitting Cruz's statements as coventurer statements and thereby violated his Sixth Amendment right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  He also argues that, by admitting the statements, the trial court deprived him of a fair trial, and thus of due process.  The respondent asserts that this claim is not properly exhausted and that, in any case, the trial court's ruling

---

[7] The petitioner does not challenge the admission of his own statement.

was correct, as was the SJC's affirmance.   The petitioner's argument fails for several reasons.

First, the petitioner arguably has not exhausted this claim. "In order to promote principles of comity and federalism, 'a federal court will not entertain an application for habeas relief unless the petitioner first has fully exhausted his state remedies in respect to each and every claim contained within the application.'"  *Fusi v. O'Brien*, 621 F.3d 1, 5 (1st Cir. 2010) (quoting *Adelson v. DiPaola*, 131 F.3d 259, 261 (1st Cir. 1997)). The SJC explicitly noted that, in his direct appeal, the petitioner "d[id] not challenge the admission of Cruz's statements on the ground that they were testimonial statements the admission of which violated the [petitioner's] right to confront witnesses against him." *Lopez*, 151 N.E.3d at 373 n.4.  The petitioner contends that he nonetheless fairly presented the issue in his brief to the SJC because "he identified the federal constitutional right of confrontation and its Sixth Amendment guarantee and cited two federal constitutional precedents[.]"  (Dkt. No. 19, Petitioner's Reply Brief, p. 14).  This is something of an overstatement.

The thrust of the petitioner's argument to the SJC on this issue was that the trial court erred in admitting Cruz's statements under Massachusetts evidentiary law.  He only mentioned the Sixth Amendment in the final paragraph of his argument, and then only as a means of explaining why the allegedly erroneous evidentiary

decision was prejudicial. Notwithstanding the petitioner's perfunctory gesturing toward the Sixth Amendment and a pair of Supreme Court decisions (one presented through the lens of an SJC decision citing it), it is hardly clear that this one sentence, in context, should have sufficed to alert the SJC that the petitioner was raising a federal Confrontation Clause claim above and beyond his state-law evidentiary claim. *See Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (petitioner "must 'fairly present' his claim in each appropriate state court . . . , thereby alerting that court to the federal nature of the claim"). *But see Barresi v. Maloney*, 296 F.3d 48, 52 (1st Cir. 2002) (petitioner may fairly present a federal constitutional issue through, *inter alia*, "citing a specific provision of the Constitution [or] reliance on federal constitutional precedents"). Ultimately, though, this court need not dwell on the exhaustion issue because the claim clearly fails for other reasons. *See* 28 U.S.C. § 2254(b)(2).

In that regard, although the petitioner presents this claim as a federal constitutional issue, it in reality asserts a claim that the SJC (and the trial court) erred in applying state law to resolve an evidentiary issue and is thus not cognizable on habeas review. The petitioner acknowledges that the Confrontation Clause "does not bar the use of a co-conspirator statement made in furtherance of the conspiracy and admissible under a traditional hearsay exception." (Dkt. No. 13, p. 27); *see Davis v. Washington*,

547 U.S. 813, 821 (2006) (Confrontation Clause only covers "testimonial statements"); *Crawford v. Washington*, 541 U.S. 36, 56 (2004); (statements made "in furtherance of a conspiracy" are nontestimonial by nature). Rather, the petitioner's entire argument is that the SJC erred in deciding that Cruz's statements qualified as coventurer statements and that, absent the coventurer exemption, the statements were testimonial. As such, the argument focuses entirely on the SJC's alleged misapplication of Massachusetts law on hearsay exemptions. This court is neither inclined nor empowered to reconsider the SJC's rulings on Massachusetts law. *See Estelle*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Put more simply, an alleged misapplication of state law does not entitle the petitioner to habeas relief. *See* 28 U.S.C. § 2254(d).[8]

Finally, even assuming *arguendo* that Cruz's statements did not qualify as coventurer statements, the statements, notwithstanding his contention to the contrary, were

---

[8] In any case, the petitioner's arguments on this point lack merit. He argues that (1) the Commonwealth did not show the intent to kill required to establish a joint venture and (2) Cruz's second statement ("Did you get him?") was made after the crime was completed, and thus not in furtherance of the alleged joint venture. As discussed above, there was ample evidence that the petitioner and Cruz at least intended to cause the victim grievous bodily harm, which is sufficient intent for murder. As to the petitioner's second argument, Cruz made this inquiry before he and the petitioner fled the scene, apparently intending to confirm that the joint venture had achieved its objective. Such a statement was clearly made in furtherance of the joint venture notwithstanding the fact that no one was actively attacking the victim by that point.

nontestimonial in nature and did not implicate the Confrontation Clause. *See Davis*, 547 U.S. at 821 (citing *Crawford*, 541 U.S. at 51; The Confrontation Clause only applies to "testimonial statements."). A statement is testimonial if it is "procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 562 U.S. 344, 358 (2011); *see Ohio v. Clark*, 576 U.S. 237, 246 (2015) (finding statements were nontestimonial because they were "clearly not made with the primary purpose of creating evidence for [the defendant's] prosecution"). "The determination as to whether a statement is testimonial is an "objective[] evaluat[ion of] the circumstances in which the encounter occurs and the statements and actions of the parties.'" *United States v. Estes*, 985 F.3d 99, 103 (1st Cir. 2021) (quoting *Bryant*, 562 U.S. at 359) (alterations in original). Under the primary purpose test, statements made to private individuals "are much less likely to be testimonial than statements to law enforcement officers." *Clark*, 576 U.S. at 246.

Cruz made two sets of statements: one while the petitioner was chasing the victim around the parking lot and one as the victim fell immediately after the stabbing. Nothing Cruz said identified the petitioner or laid out the facts of the murder in any way that would resemble trial testimony. Indeed, Cruz's remarks consisted

entirely of questions and commands, not statements of fact.[9]  His
statements were made during and in furtherance of the attack on
the victim.  Furthermore, there were no law enforcement officers
present at the time, placing this case well outside the heartland
of Supreme Court Confrontation Clause jurisprudence, which most
often concerns statements made to law enforcement during
questioning.  *See, e.g.*, *Bryant*, 562 U.S. at 349; *Davis*, 547 U.S.
at 817-21; *Crawford*, 541 U.S. at 38-41.  Instead, Cruz made
spontaneous, unsolicited statements to private individuals.  *See*
*Clark*, 576 U.S. at 246.  Moreover, the facts suggest that Cruz may
not have even been aware of the witnesses who ultimately testified
as to what he said.  The petitioner makes no effort to explain
how, under these circumstances, Cruz's statements could possibly
have been "create[ed as] an out-of-court substitute for trial
testimony."  *See Bryant*, 562 U.S. at 358.

    For all these reasons, the petitioner is not entitled to
relief on his Confrontation Clause claim.  As to his related due

---

[9] For this reason, Cruz's statements likely are not hearsay in the first place.
*See United States v. Diaz*, 670 F.3d 332, 346 (1st Cir. 2012) ("Out-of-court
statements providing directions from one individual to another do not constitute
hearsay."); *United States v. Thomas*, 451 F.3d 543, 548 (8th Cir. 2006)
("Questions and commands generally are not intended as assertions, and therefore
cannot constitute hearsay."); *United States v. Wright*, 343 F.3d 849, 865 (6th
Cir. 2003) ("[A] question is typically not hearsay because it does not assert
the truth or falsity of a fact."); *United States v. Vest*, 842 F.2d 1319, 1330
(1st Cir. 1998) (quoting Fed. R. Evid. 801(c)) ("[W]hat Waters said in the
recorded conversation was not hearsay at all. . . . [H]is statements were merely
questions to Davis, and were not 'offered . . . to prove the truth of the matter
asserted.'"); *Bolen v. Paragon Plastics, Inc.*, 754 F. Supp. 221, 225 (D. Mass.
1990) ("According to the very definition of hearsay, an inquiry is not an
assertion, and therefore does not constitute hearsay.").

process claim, the petitioner makes no attempt to explain how the state court's evidentiary ruling "was so arbitrary or capricious as to constitute an independent due process . . . violation." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  The only argument the petitioner offers on this point is that the state court committed "a due process violation by depriving him of his confrontation right and, in turn, offend[ing] a fundamental principle of justice." (Dkt. No. 13, p. 30).  Because, as explained above, the petitioner's Confrontation Clause argument fails, any due process argument dependent on a violation of his confrontation rights necessarily also fails.

## VI.  CONCLUSION

For the foregoing reasons, the Petition for a Writ of Habeas Corpus should be DENIED.[10]


/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED:  October 6, 2023

---

[10] The parties are hereby advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  *See Keating v. Secretary of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *see also Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L.Ed.2d 435 (1985).